(49 South. 700.)

No. 17,320.

NEELY v. ORLEANS METAL BED CO.

(May 24, 1909.)

MASTER AND SERVANT (§ 96*)—INJURY TO SERVANT—NEGLIGENCE—PROXIMATE CAUSE OF INJURY.

Where plaintiff, suing for damages for personal injury alleged to have been sustained by the fault of the defendant, fails to discharge the obligation of proving, with reasonable certainty, that the injuries complained of are attributable to such fault, he cannot recover.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 96.*]

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Thomas C. W. Ellis, Judge.

Action by J. D. Neely against the Orleans Metal Bed Company. Judgment for plaintiff, and defendant appeals. Reversed, and judgment rendered for defendant.

Clegg & Quintero, Fernand Fortuné Teissier, and Victor Leovy (John May and Morgan & Milner, of counsel), for appellant. Cage, Baldwin & Crabites, for appellee.

Statement of the Case.

MONROE, J. Plaintiff, whilst in defendant's employ, engaged in pouring molten iron into a "chill," or mold, lost one of his eyes and was subjected to great suffering, by reason of the metal's having been blown out of the chill, through the "gate hole," a result which he attributes to the negligence of the defendant. He therefore prays for damages. Defendant denies the existence of the conditions described in the petition, and otherwise pleads assumption of risk and contributory negligence. The facts, as they appear to us, from the transcript, are as follows:

Plaintiff, at the time of the accident (in 1907), was about 22 years of age. He had obtained his education at several schools and colleges and had been finally graduated in, say, 1905 or 1906. He then found employment, for a few weeks, in the credit department of a business house; then, for a time not stated, in a boiler shop; then, in a hardware store; then, for a week or two, in a bed factory, such as that conducted by defendant; then, in a similar factory; then, with a lumber company; then, for eight months, in a foundry; and, finally, about July 1, 1907, in defendant's establishment, where he did some work, the precise character of which is not stated, until August 3d, when he was given the job of pouring molten iron into "chills," and was so employed until September 27th, when the accident occurred out of which this suit has arisen.

According to his testimony, he was employed in the foundry, as a helper, and his work was the carrying of the molten metal from the "cupola," where the melting was done, to the pourer, by whom it was poured into the chill. His cross-examination proceeds as follows:

"Q. Did they ever have blow-outs? A. Yes, sir; every day. Q. Did the men get hurt? A. Sometimes, lots of them. * * * Q. During your employment there, as a helper, you almost daily saw the molten metal explode and blow out? A. Yes, sir. Q. Did you see the men get hurt at any time? A. Yes, sir. Q. How long did you work there? A. I worked there about eight months. Q. Did you remain there during the time these men were pouring the metal? A. I had to remain there and help. Q. Did you remain there and see it done? A. Yes, sir. Q. Then these eight months you got to know of the danger? A. Yes, sir; but only one man got hurt while I was there."

He further testifies: That he applied to defendant's superintendent for work and was, by him, referred to Vosloh, the foreman; that he then called on the foreman and told

him that he would like to be an iron pourer. Being asked, "Did you tell him that you had seen men pour iron for eight months in the Bancroft, Ross & Sinclair Co.?" he replied, "Yes, sir," and, at another time, he says, "I expected to see a blow-out every time I poured a chill, and I kept my head away from it."

He, also, testifies that, in the bed factory in which he had previously worked, he had seen the cupolamen wear goggles, and that he made some inquiry of Vosloh about their use, and it otherwise appears that he was furnished with goggles, or had a pair, when he started to work. As has been stated, he began the work of pouring on August 3d, and continued in that work until September 27th. He was working by the piece, and not by the day, and was therefore interested in filling as many chills as possible; his earnings varying from $1.40 to $3.05 per day, according to the amount of work done. The implement used by him was a ladle, with a handle about four feet long. He says that one can pour more quickly by holding the ladle short (i e., by grasping the handle nearer to the ladle than to the end of the handle), and the evidence is conclusive to the effect that his habit was to hold the ladle in such a way, whilst pouring, that his nose was only about 13 inches from it; whereas, the other operatives so held their ladles as to keep their noses twice that distance from them. It is also shown that, about 10 minutes before the accident by which plaintiff was injured, he was warned:

"You had better hold it [the ladle] further from you, or you will be hurt."

Plaintiff was asked, "How often, from August 3d to September 27th, did this metal blow out of the mold?" to which he replied, "I couldn't tell you that; I had it blow out nearly every day, on the first pour, though." It may be here stated that defendant's business is the making of bedsteads of iron tubing; the tubing being purchased from the manufacturers and manipulated into bedsteads. One of the features of the work is the adding to the tubing (whether for utility or ornament does not appear), of what are called "rosettes," being, as we understand it, knobs, or excrescences, of iron, which are molded on the tubing, where needed, or desired. Thus, there is a "chill," or mold, which has the appearance of a cube, measuring, say, three or four inches each way. It, however, consists of two halves, which are hinged together, and, when closed, are fastened with a clamp; the inner sides being hollowed into a matrix in which the rosette is molded. There is an aperture, by means of which the tubing is inserted into the matrix, and another, through which the molten iron is poured, to form the knob, or rosette, around the tubing, and there is, also, as we understand it, a vent, for the escape of the air whilst the pouring is done. If there is any moisture in the matrix, when the molten iron is poured in, there will, almost inevitably, be a "blow-out," of greater or less force, through the aperture into which the iron is poured; the explosions of less force being called "spits." Certain kinds, or degrees, of rust, it appears, contain moisture. Hence, when the tubing in the matrix has rust upon it, of those kinds, its moisture, like any other, will produce a "spit" or "blow-out," when converted into steam by the advent of the molten iron. As the night air is likely to condense upon the surface of the matrix, or perhaps produce a film of moisture laden rust, the invariable practice is to give the matrix what is called a "cold wash" every morning, before the work begins (the cold wash consisting of wiping it out with a preparation of oil and graphite), which greatly reduces the chances of a "blow-out" from moisture.

"Blow-outs," from that cause, or others, are, however, matters of common occurrence, on the first pourings of the day; but, after

the matrices have been once filled with the molten iron, they become so heated that, ordinarily, but little, if any, moisture remains in them, and, unless it is introduced with the tubing, there appears to be but little danger of blow-outs from that cause. Nevertheless "blow-outs" do occur on the subsequent pourings, as well as on the first; sometimes, from the introduction of rusty tubing, and, at other times, for the reason stated by defendant's foreman, who says:

"But the pourer sometimes causes the trouble himself. If he pours it in too fast, it will stop the vent in the chill and blow it right up; but, if he pours it in gently, there will be no trouble."

There is a workman who is called a "framer," who frames the tubing into the bedstead, "cold washes" the chills every morning, and adjusts the tubing in them for the molding of the rosettes.

The framer who prepared the chill, the blowing out of which caused the accident here in question, testifies, in part, as follows, to wit: That he gets the tubing as directed by the stockman; that it is not his duty to clean the rust off; that the tubing that he put into the chill that caused the accident was very rusty; that he knew that rust was dangerous; but that he had to use what was given him; that he did not tell Neely (plaintiff) that the tubing was rusty. He also testifies that the chill in question had already been once filled, and had blown out. "I opened the chill" (he says) "and knocked the iron out. I took my little brush and closed it up. When he poured again, she blew out, and that's the time it struck him." At another time he says:

"The chill was hot; it was after the first piece (pour), between the second and third, I think. I know it had been poured once."

He further testifies as follows:

"Q. If you had taken a rag and wiped off that tubing, would there have been an explosion? A. I don't think. Q. Didn't you have a rag? A. No, sir. Q. Didn't you have a rag? A. We have a pad. Q. Wouldn't that answer the same purpose? A. I don't think so. It was dry. Q. Why didn't you try to do it? A. I never do that. * * * Q. I asked you if that piece of tubing was put in? You want to say, now, you put in the same tubing and it blew out the second time? A. Yes, sir. Q. Did not the rust blow off on the first occasion? A. I couldn't say. Q. Did you look? A. No, sir. Q. Could the blowing out be caused by dropping the iron in too fast? A. Yes, sir; a small puff. It might go an inch over the chill, and the chill is about three inches wide. Q. Is that the kind you use down there? A. Yes, sir. Q. What is a spit? A. It comes out of the gate hole and runs down. Q. Wouldn't it throw 12 inches? A. It may turn about a foot or something. Q. When a chill is on a level with the face, wouldn't it be liable to hit a man in the eye? A. Yes, sir."

At the same time, the witness says that he was standing about three or four feet from plaintiff when the accident occurred, and saw it; that he (plaintiff) had his hand at the chill and was looking towards the ladle.

Vosloh, defendant's foreman, testifies that he showed plaintiff how to do his work, "by taking the ladle with him and showing him how to handle it, and to keep his face away from the ladle; * * * told him he should be careful to keep his face away from the ladle, so, in case of a blow-out, it would not catch him in the face; * * * told him to be careful, all the time. You don't know when you are going to have a blow-out." He says:

"Every man in the factory has a rag, because the chills are so hot. He has instructions to wipe the rust off [of the tubing before putting it in the chills]. The only person ever seriously hurt [by a blow-out] is this man, Neely."

He says that a rag, with a little oil on it, will remove the rust, or, if the rust is very bad, that it may be removed with sandpaper, and that he had sandpaper for that purpose, and a boy to use it; that it is impossible for him, as foreman, to inspect every piece of tubing that is put into a chill; and that the framer, who puts the tubing in, is depended on to make such inspection.

Dr. A. L. Metz, called by plaintiff as an expert chemist, testified to certain experi-

ments that he had made, for the purposes of the case; but his testimony, on that subject, has been so badly written out by the stenographer as to be unintelligible, save with the aid of certain corrections which appear upon the face of the transcript, but which, it is conceded, were informally made, and which defendant's counsel do not appear willing to recognize. Before reaching that point, however, the witness qualified as an expert chemist, and plaintiff's counsel asked him:

"Doctor, several days ago, I called on you, at your office, and stated to you the facts in this case, as I knew them, and asked you to investigate the matter so as to be enabled to enlighten the court and jury, on the trial of this case, with reference to explosions, caused by rust. Have you made an investigation, and have you made the experiments that I requested? A. I have. Q. There is a statement here, from several witnesses we examined, to the effect that, where an iron mold, which they call a 'chill,' is fastened around a tube, if the tube is rusty, it will cause an explosion. A. I told you that I knew nothing about it, and I thought I would have to make the experiments, that, theoretically, it looked like it would be a practical cause, but I would have to make experiments."

His testimony as to his experiments (taking into account the corrections mentioned) is about as follows: He made three experiments, using sand molds.

Into mold 1, after putting in a mixture containing 95 per cent. of sand and 5 per cent. of graphite, thoroughly dried, under heat, he poured molten iron, and there was no explosion or spitting.

Into mold 2 he placed a quantity of "high dried" rust; that is to say, rust that was dried until it ceased to lose weight and was constant in character, and, upon the rust, poured molten iron—with no result.

Into mold 3 he placed "a quantity of rust, specially prepared, and subjected it to the heat of a water bath for about five hours, at a temperature of 100 degrees F. until it ceased to lose weight. The proportion of rust in this mold was 1 to 100, by weight."

He then poured his molten iron in, and the metal was thrown out with violence, fully 20 feet. The doctor explains the results obtained from molds 2 and 3 (in which, alone, rust was used) by saying that the rust used in mold 2 was very old and had been heated to a temperature of, say, 300 degrees, from which he concludes that the moisture was all out, whilst the rust used in mold 3 was a new rust, or ferric hydroxide, which, while it held no ordinary moisture, contained the "water of constitution," held by the oxide, and he concludes that some rust, under the conditions in question, will produce an explosion, and other rust will not. He says:

"Where there is yellow oxide of iron, there might be trouble. I would have hesitation from my past experience, if it was a yellowish rust, or even a brownish rust, I would have hesitation in pouring molten iron into it."

He says he does not know whether oil, put on a rusty tube, would prevent an explosion, under conditions mentioned, or not. He is asked: "Taking a tube without rust and very dry, would you have any fear of explosion?" and he replies:

"Frankly speaking, I don't know. If it had a rust of a brownish appearance, I would fear it; but, if the color was a reddish red, I would not fear it. Rust may be an ordinary oxide of iron, and, as it holds more or less of the water of constitution, it becomes more or less explosive when subjected to high temperature of molten metal, in a confined space. Q. Doctor, do you know anything about air bubbles in a tube? A. Yes, sir. Q. Would that cause an explosion? A. No, sir; I know more about bronze than I do about iron in that regard. Q. Are there any other agencies that cause an explosion, besides the constitution (al) rust and air bubbles? A. I cannot conceive of any [as amended, 'any agency other than rust'] just now."

The general run of the testimony of the workmen, based on experience, is that the likelihood of a "blow-out" from rust seems to depend largely upon the quantity of rust, and Mathern testifies that the rust on the tubing in question was "kind of reddish."

Several witnesses say that, soon after the accident, and at the time when he was suf-

fering a great deal, plaintiff said that it was his own fault. There was a verdict for plaintiff in the sum of $2,000. and it appears that the jury stood 9 to 3. Defendant's counsel say, however, that when first polled they stood 8 to 4, and that they were sent back, and that the vote which constituted the verdict was the result of the second attempt. However that may be, the verdict was made the judgment of the court, and defendant has appealed.

## Opinion.

It appears to us that there was a good deal of negligence on both sides. There is no doubt that defendant knew that the pouring of molten iron on rusty tubing, confined in a chill, was likely, if not certain, to produce an explosion, and, instead of dealing out tubing of that character to the framers, and relying on them, working, as they were, by the piece, to expend their time in cleaning it, defendant should have employed some one for that purpose. Upon the other hand, though plaintiff says that he did not know that rusty tubing was dangerous, we do not see how he could very well have escaped the acquisition of what appears to have been common knowledge; nor do we see that it makes any difference whether he did so or not, since he states, in his testimony, that he expected a blow-out every time he poured the iron into a chill. He was therefore apprised of the danger, though he may not have known the source, and he knew the precautions which should have been taken to guard against it. John Bruza, a witness called on his behalf, testifies that, when he started to work, plaintiff had a pair of goggles, and it is impossible that he could have worked, as he did, in a foundry, for eight months, seeing "blow-outs" nearly every day, and should have had the same experience for, say two months, in defendant's employ, without knowing what they were intended for. Moreover, he himself says that he asked the foreman about gog-

gles, and the foreman says that he thinks he advised him to wear them. It appears, however, that for some reason, possibly because they were inconvenient, none of the workmen wore them, and plaintiff testified that he never had a pair on. There seems to us to be no doubt that plaintiff was shown how to handle his ladle and was especially cautioned to keep his face as far away from it as possible, and the witness Ruppert, whose attention was attracted by the manner in which he was handling his ladle, warned him, not more than 10 minutes before the accident, "You better hold it further from you, or you will be hurt"; the fact being that, though other workmen kept their faces (measuring from the point of the nose) 26 inches from the mouth of the ladle, while they were pouring, plaintiff's habit was to shorten his hold, thus bringing his face within, say, 13 inches of the ladle, and we conclude from his testimony that this was done in order to enable him to pour more quickly, fill a greater number of chills, in the course of the day, and thereby earn more money. This was objectionable, however, not only because of the increased danger to which he subjected himself by bringing his face so near the chill, into which he poured the metal, but for the further reason that, in pouring too quickly, he incurred the danger of a "blow-out," of less force, perhaps, than those produced by moisture, converted into steam, but of sufficient violence to reach his face. Now it is true that Dr. Metz, according to his corrected testimony, says that he cannot conceive of any agency, other than rust, that would cause an explosion; meaning, of course, an explosion as the result of pouring molten iron into a chill in which there is already iron, unmelted. But that statement is, probably, broader than was intended, for, if it be the water, in the rust, which produces the explosion, under such conditions, a fortiori, will water, of itself, produce

that result. Dr. Metz, however, qualified as an expert chemist, and not as a foundryman or a metallurgist, and he began his testimony by saying, in answer to a question as to the effect of pouring molten iron into a chill, upon a rusty tube, that he had told the counsel that he knew nothing about it, and that he would have to make experiments. His information, upon that subject, is therefore based upon the three experiments, with sand molds, to which he testified. He does not tell us that he made any experiment in order to ascertain whether an explosion can be produced by pouring molten iron too rapidly into a metal chill, or that he has any scientific information on that subject. Upon the other hand, some of the witnesses who have testified have been earning their livings by pouring molten iron into chills and by other work which has compelled them to witness, and practically participate in, that operation many thousands of times; the evidence showing that defendant turns out some 150 bedsteads per day, and there being a number of knobs, or rosettes, on each of them. Assuming, then, that Dr. Metz may not be aware of it (any more than we are aware of it, save for the testimony in the record), it may, nevertheless, be a fact, and we think that we shall have to accept it as a fact, that an explosion may be produced by pouring molten iron too rapidly into a chill, and, that being the case, the question is: To which of the two causes is the explosion by which plaintiff was injured to be attributed? The fact that the tubing that was put in the chill was rusty is established beyond doubt; but it is hard to understand how the rust that was on it, when put in, could have had anything to do with the explosion in question, since there had been a previous explosion, only a few minutes before, produced, it is supposed, by pouring molten iron on the same tubing, and if, as Dr. Metz's experiment shows, 300 degrees of heat is sufficient to dry rust, how much more is it likely to have been dried by a bath of molten iron, the temperature of which is, say, 2,000 degrees. Of course, it may be possible that the rust, on the tubing in question, still contained water; but it does not seem to us probable, and the plaintiff should not only make his case probable, but should establish it with reasonable certainty. Whether, if it were certain that the explosion was caused by the rust, plaintiff would be entitled to recover, in spite of his failure to wear goggles and to keep his face away, as far as possible, from the point of danger, is a question that we need not decide, for it would be idle to attempt to draw conclusions from premises which have no existence. On the other hand, if the accident was caused by his pouring the molten iron too rapidly, he is not entitled to recover. He came to the defendant asking to be employed as an iron pourer, and recommended himself by reason of the fact that he had been previously employed in an iron foundry, where, for eight months, he participated, as a helper, in that kind of work, and he was shown by defendant's foreman how to handle his ladle and to pour the iron. If therefore, in his anxiety to earn additional compensation, he poured it too quickly, he cannot lay the blame on the defendant. Our conclusion, then, is that the obligation resting on plaintiff to show, with reasonable certainty, that the injury of which he complains is attributable to the fault of the defendant, has not been discharged, and hence that he ought not to recover. It is therefore ordered, adjudged, and decreed that the verdict and judgment appealed from be set aside, and that there now be judgment rejecting plaintiff's demand, at his cost in both courts.